15-10655, Timothy White v. Regional Adjustment Bureau v. Noah Radville. Thank you, Your Honors. Good morning. I please the Court. My name is Rafi Malconian for the appellant Noah Radville. My client, Noah Radville, was suspended from practice in the Northern District of Texas for allegedly committing bad faith misconduct. I want to be very clear about that. Mr. Radville did not commit bad faith misconduct, and he stands ready to challenge those facts before, we hope, on remand in front of the District. I don't see that the time has started. I'm sorry. It's okay. It's not your fault. Okay, I think this is the problem, is that even now, years into this, and we've had time for reflection, we are still not seeing any contrition out of Mr. Radville. And I will tell you this, that worries me the most in terms of evaluating this case and whether Mr. Radville should be permitted to continue practicing in the Northern District of Texas. It's the fact that he has zero understanding of how his own conduct has led to him being here today. Do you understand that concern? I deeply understand that concern. But let me tell you that I disagree with Your Honor as to the characterization of Mr. Radville's contrition. I think Mr. Radville, and it's in the record, has apologized to the court for what he did. The question is— Okay, but he hasn't admitted to doing anything other than being two hours late, which he claims is based on lactose intolerance, although he has yet to produce, so far as I can see in the record, any medical evidence to support that. So other than that, he's saying I didn't do anything wrong. I told five different stories several different times about several different things, and there's nothing wrong with that. I mean he's owning that. I don't think that that's what Mr. Radville says, and that's not what I tried to say in my brief. Mr. Radville refused to apologize at the end of the trial, the sanctions hearing, when the court said Mr. Radville basically—and I'm paraphrasing, I'm sorry— did you commit bad faith misconduct? And Mr. Radville said no, because if he had said yes, we wouldn't be here. He would have conceded disappeal, and that's why he— So it's your point that while he may have made mistakes along the way, that none of those arrive to the level of bad faith if you look at each one of these. Exactly right. And so it would be wrong for him to say he committed bad faith when all of these mistakes, none of them are bad faith. That's right, Your Honor. He doesn't accept that he committed bad faith. He accepts that he fumbled his case, that things didn't go well, that obviously if he had— Okay, well I haven't seen much of an apology for mistakes or anything else, depending on how you characterize—regardless of how you characterize it. I mean I understand him not wanting to concede he should be suspended from the practice law for three years. I get that. But to me, the overall tenor of your brief and everything this guy's done, which got Mr. Myers in trouble as well, is I didn't do anything wrong, period. Period. Regardless of whether you call it a mistake, you want to call it intentional, you want to call it fumbling balls, you want to call it anything, he's saying I didn't fumble the ball. In fact, I scored a touchdown. Can we take a look at that? Did he, in fact, acknowledge that he made an error in typing one instead of none? Yes, Your Honor, he acknowledged that error. Did he, in fact, acknowledge that he made an error when he didn't pay his state bar dues on time? Yes, Your Honor. Did he, in fact, apologize to the court when he was late to court? Yes, Your Honor, he did. Did he, in fact, apologize for designating witnesses late, but say he had to do it because once he became aware of them, he needed to do the designation as if he was an officer of the court? Yes. Okay. Absolutely. Okay, but he first didn't want to admit that he had been suspended from the bar. In fact, he said for nonpayment of dues, he said he didn't know the effect of that. Well, I think he was trying to explain that there's a difference between being disbarred because he did something wrong and being disbarred because as a matter of his administrative help, he didn't pay his dues. No, but they asked him that because of failure to pay dues, and he still said he didn't know what the effect of failing to pay your dues is. Whether it was administrative or whether it was meritorious suspension. In fact, he was renewed immediately on the spot. Why was that even part of the case, by the way? This wasn't in this proceeding, was it? It was not. So how does that have anything to do with the court's inherent power or the discovery in this case, which are the things we're dealing with, discovery, trial practice, and then inherent power? The fact that one time he didn't pay his dues on time, it just seems like that was brought up to blind him in some way. Your Honor, I don't want to make that sort of claim, but it was clearly something that was brought in to make him look bad in front of this court. And my view is that the inherent powers exist to protect the jurisdiction of that court. Okay. I do have some hard questions, I think, for you, though. You have not mentioned anything about the money. The brief doesn't talk about the money, the attorneys. It talks about – I guess you say the money rises or falls with whether you win on the merits, but you haven't specifically disputed any of the money. Well, there's two reasons for that. One is I do think it rises and falls based on the entire sanction. I think it's one sanction, $60,000 plus an inherent power suspension. Actually, they're both under the inherent powers, but a suspension from three years. The second thing is the actual dollar amount hasn't been decided yet, so I haven't challenged the specific claims that the other side has made about the dollars. Okay. So the dollar amount hasn't been decided by the court yet because it's still on a – the court curtailed that? I thought they were supposed to submit their bill, and the court didn't rule on it? The court has not ruled on it, Your Honor. The court may have taken the position that the stay entered by the court stayed that too. I don't know. But the specific judgment in terms of the money damages had to be – What is the approximate amount being sought? It's about $60,000. $60,000 total for both – for the real – the trial and the merits and also the series of hearings about the ethics? It's one-third of the trial expenses and the entirety of the sanction. And the entirety of the other, and that's $60,000? That's $60,000. And it's joined in several – your client and the other gentleman? Mr. Myers, yes, Your Honor. Mr. Myers? Is it the firm too, joined in several, or just Mr. Myers and Mr. Radville? You know, I'm not sure about that, Your Honor, and I thought it was the firm as well, but it may just be Mr. Myers. Okay. Tim, another question I have for you has to do with – the record says – I've read hundreds of pages of these hearings, and the record says that the client didn't know about the money owed for the $10,000 of court costs, something like that, $10,000, and has that been paid? And I want to know if the court costs have been paid, and what is the record on that at this point? In terms of the record on appeal, I don't think there's anything in there, and I personally don't know whether the court costs have been paid. Maybe I'm forgetting. Maybe the opposing counsel will know the answer to the question of whether that has ever been paid. I honestly don't know. There's no good reason for that not to be paid, is there? As far as I know, no, but I haven't looked into it. Okay. Counselor, he lives in Houston now, doesn't he? Yes, Your Honor. No longer imposed upon severely by not being able to practice in the Northern Division? No, Your Honor. In fact, he's very severely imposed by this sanction because most of the districts have automatic reciprocal disbarment. Three of the four districts in Texas have that, and most of the districts across the country have that. And given that Mr. Radville generally practices in the federal court, this is essentially a disbarment of his entire practice. It's not just in the Northern District. Which one doesn't have Southern? I believe the Eastern District doesn't. Eastern doesn't? So he would automatically be disbarred in Southern if he was disbarred in Northern? Yes, Your Honor. That's my understanding, unless I've mixed that up. But one of the districts doesn't. Well, doesn't it matter if he lives in Houston whether it's Southern or not? I mean, wouldn't that be a significant fact? Well, no, Your Honor, because he has sort of a Texas-wide federal practice. But I do think that it's the Southern District that does have automatic disbarment. Okay. And you say disbarment, I would extend it to suspension as well. So, in other words, reciprocal discipline with whatever they did in Northern. Yes, there doesn't need to be another procedure. Let me ask you this. When we talk about inherent authority, you know, to get admitted in the Northern District in the first place, you've got to fill out a form and some judge has to approve you. And so far as I know, they don't have to approve you. I don't even know what the remedy is that they don't, but they don't have to approve you. And so Judge Boyle in her findings was talking about, you know, not just whether he was in bad faith, although that was one of her findings, but also that he was incompetent. And, I mean, the problem is it's kind of one or the other or both, in my view, because he's either just grossly incompetent or he is intentionally lying to the court or some mixture of two, one to cover up the other perhaps. And if you make that finding, and I understand you challenge some of those facts and so forth, but if you make that finding, then isn't the Northern District allowed to say we don't want this person in our district? Not under the inherent powers, at least in my view. I mean, to me, the inherent powers are at the core of federal authority. They're what you unleash when there's nothing else that can save the justice of the court. And that's what this court envisions. Yeah, but this is the – this isn't like a plan in where there was sort of a fine, whatever you wanted to call that, the $300,000 that was then subsequently reduced. Here they're saying, you know, we have this membership in the Northern District. We have this admission to the Northern District that we control. We, the judges in the Northern District. I mean, they won't even let me do the admission process except with special dispensation from my law clerks, okay, in my office in the Northern District. And so that's something that's guarded by the Northern District judges. And I don't think it's unique to them. I'm not fussing with them. And so they said we don't want to just let everybody in. And if somebody isn't able to do the job and is lying to courts and or incompetent in covering it up, we don't want them in our courts. Why isn't that within the rubric of just the admission process? I agree, Your Honor, that if the court had wanted to, it could have said, as a matter of our local rules, we are withdrawing the admission of Mr. Radville and let him reapply. I think that's not beyond the court's power. That's not what this court did. I mean, she did fight to that local rule. She did, but she's very clear about what power she's using. And she says, I invoke the inherent powers to find that Mr. Radville committed bad faith misconduct. She did not find that his incompetence justified him being removed. That's not what she said. Well, she said it was one of the factors, and she does mention his incompetence. She does say that, Your Honor, and it's in the opinion. But I think when you're faced with a sanction that says someone committed bad faith, he lies to a federal judge, that has to be evaluated as an inherent power sanction. Okay, so let me ask you this. Let's say that we determined that the three years is not supported by the findings, but also that this notion that he just made a couple of mistakes but otherwise did this tremendous job is also not supported by it. What would be the outcome then? I mean, do we send it back to – and I know you want to go to a different judge, but we don't agree with that. So we send it back to Judge Boyle. Do we then open up the pamphlet, including perhaps withdrawing the admission and letting him reapply? Do we, say, look at other number of years, maybe fewer than three but more than zero? I mean, what would the remand look like in a situation like that? Well, I think you can do all of those things. There's two sort of big paths you can take. One is what they did in Tapalia. Remanded with instructions. When it comes back again, render judgment and say, look, this obviously didn't work out. Let's just finish this. Well, you shouldn't assume that it's not – that it's going to come back again. Well, no, I don't assume that. So remanded with instructions. What would the instructions say? I think the instructions, if you're going to remand, would at least say, from my perspective, the suspension should be out of the question. We have reviewed this record, and in terms of an inherent power, bad faith suspension, that shouldn't be in the pamphlet. You are required to consider other lesser sanctions, including the ones that Mr. Randall brought up during the sanctions hearing. Public reprimand, just a fee, CLEs, mentorship, whatever it is. And you are required to explain which one you impose and why the other ones are not appropriate. Why a suspension off the table if we think three years is too much, but we agree that he committed – that the finding of lying and so forth is not clearly erroneous? Well, if that's what you believe, Your Honor, then yes, of course you have to leave the suspension on the table to some extent. Again, I don't agree with that argument, but if I did – I'm interested in this withdrawal of his permission to be a member of the Northern District. How would that play out? So she just revokes his admission to the Northern District and says go reapply, and then he reapplies, and she or another district judge says we're just not going to admit you. Then what? Well, first of all, that result would not require him to be disbarred in all these other federal districts. So that's a big difference for Mr. Radville. But she can't just unilaterally revoke his admission either without proceedings under the thing, and don't they have a court system? Or can she unilaterally? The Dallas rules used to have a very elaborate procedure for how you did it. I thought there was a procedure that you had to go through. They used to have – you went to the chief judge, and the chief judge appointed somebody, and it was a very fair – And we have that sort of thing. They don't have that anymore? I think she probably could withdraw his admission, but I don't think that's a disbarment. I don't think it's a suspension. I think it's administrative technical. Let me ask you this. Do we have the power to say the suspension stands but the other courts are barred from imposing reciprocal discipline? Can we do that? Do we have that power? I haven't thought about it. I feel like you would as sort of coordinate branches of the federal judiciary. I don't know that you can do that. We're not really coordinate. We're respectful of the district courts, but I don't know that we're coordinate. We're different levels. I agree. I don't know that it's a good idea. I'm just asking you. I haven't thought about it, but I feel like there would be a problem. There's some sort of structural – I don't want to call it separation of powers, but there's some kind of problem in that that I would have to think about. That's fair. I think everybody should have two extra minutes. You get two extra minutes because I think we have more questions. Of course, from my perspective. I'm ready to answer as many questions as you have. I have questions about the role of opposing counsel if we were to remand. It would seem to me that opposing counsel would only have the right to participate with regard to the monetary sanctions and not to bring forth arguments and that sort of thing about disbarment under our precedent. How would we craft something like that? The way I read Coral B. Smith is that opposing counsel in these kind of quasi-criminal procedures is allowed to help the court develop the facts. So to the extent that there's further questioning, though I can't imagine in this case a further record would be helpful, but to the extent there's further questioning, further fact-gathering, I think opposing counsel probably can do that. Could the opposing counsel argue like it appears that they're going to do today, argue that the disbarment was appropriate? No, I don't think so. I think that violates Coral B. Smith. And more broadly, the idea that opposing counsel has no interest in that. Okay. Can the court appoint someone to help her, though, to prosecute that? I think the court has that authority. So the court could appoint a neutral person for that. I think the court has that authority, probably either ought to have in this case. I just wanted to, if you were finished. Go ahead. Well, I just wanted to ask on the Crow issue, if we conclude that there was nothing improper up through the order, the 80-page findings of fact and all that, is it improper for the opposing counsel to present the judge's findings and conclusions to us? I mean, in other words, is the Crow issue focused on getting to the decision by the person who has discretion, which is the district judge, or is it focused on all the way through denial of rehearing in the Supreme Court? I don't have a case on that, but I think it goes all the way through at least this court, because they're still asking for a remedy to which they have no interest, other than their view that they're representing sort of justice or the district court or whatever it is. Consumers of America. Consumers of America, they're the private attorney general, whatever it is. And I don't think that's proper. Give them two minutes more each, please. I have more questions. Assuming that – okay. We talked about the opposing counsel's participation. When you said there wouldn't be any more fact-finding, it would seem that the district court relied extensively on Judge Hughes' proceeding in the – oh, it starts with an S. Scarlett Meaney's finding. Thank you. Quoted from him, said she felt like she was him in a similar circumstance. She went on and on about that case in the trial proceeding, as well as mentioning it in the reasons of why lesser sanctions would not be appropriate. It would seem that there might be further factual development about that. I know we know that the case was reversed, but what actually happened and who's responsible and wouldn't that be – it wouldn't be for them to develop, but that would be for the non-biased prosecutor perhaps for inherent power, right? Well, in terms of what happened in the case, that case is essentially over. Part of it has officially settled. It's in the ECF docket. And other parts are coming along. I don't want to get into the details of what the settlement is,  but in terms of what happened in front of Judge Hughes, I actually think that that's not an appropriate subject for the inherent power in a particular proceeding. That may be some reason that Mr. Raddoe has a problem with the Texas bar or something. I don't know. But you don't believe it was appropriate even in the inherent power section, for the same reason that whether he had in another case not paid his bar dues on time is not relevant, and the same reason why he's in violation of the advertising rules, that's not relevant. Correct. It's the same family of things. Okay. I don't have any further questions to you. I could keep you here all day, but I think we can move to your question. Thank you. Good morning, Your Honor. Robbie Lowe on behalf of Regional Adjustment Bureau in this case. I'd like to start with answering some of Judge Elrod's questions that she had regarding the monetary issues. We did submit the additional briefing on the petition. I'm sorry, the additional petition for attorneyship. Judge Boyle has not ruled on those yet. Is it your position that those are set to stay in any way? Honestly, Judge, I think she just sort of did her own informal stay, waiting to see what happens with this matter. There was no official request for stay on their behalf, and there's not been anything from the court. Do you concur it's about $60,000? It's a little bit more than that, Judge, but not much. I think it's maybe $62,000, $63,000, somewhere in there. Okay. As to the $9,000 in court costs, those have been taken to my client, and those were paid not by Mr. Randall, they were paid by the firm. And I don't know how that worked out. Well, he was your associate at the firm, so it's not unusual that he wouldn't be individually responsible. I don't believe he was an associate at that time, Your Honor. I don't know what their arrangements were, though. I can't speak to that. He was a counsel at that time? I don't know, Your Honor. But I was saying that he wasn't a partner who would have to individually write a check or something. He had an odd relationship as it came out during the trial, so I really don't know. So, I mean, what business? That's been paid for and taken care of. The $9,000 issue. Okay. And so far as you know, the client didn't end up having to pay Dr. White. They testified from the stand that they would take care of it, and he did not. So as far as I know, Dr. White did not pay. And since he didn't testify, no one asked him. But I have no reason to disagree. And there's no appeal on the underlying merits case or anything, right? No, ma'am. It's over. Is there any more money owed by anybody? Well, whatever fees that would come out from Judge Boyle in relation to this, that's the only thing that's still pending, Your Honor. Okay. The second thing I wanted to point out or to talk about has to do with what you brought up, Judge Elrod, in terms of issues that you thought Mr. Ragdale had vented or that had been resolved. With regard to the designation of witnesses, it really wasn't as soon as he found out about it. If the court looks at the record, what we learned is that Mr. Ragdale knew about the witnesses on December 28th. And he told him mid-January. Yes, ma'am. So it was more than almost three weeks before he identified them to the other side. But that's in litigation, three weeks. I mean, did it cause any harm? Sure. If it was already late. So what additional harm did the three weeks have? Well, it goes directly to an argument that Mr. Ragdale made in his motion about the sanctions issue, which is he said that there was no harm to us if we could have taken additional time to take depositions, part of which he had not done. The other issue is despite the fact that he did— I'm sorry, I didn't hear how that harmed you. A key arc of violence. All right, Judge. It wound up not being an issue because we prevailed in trial. No, but even during discovery. If you could have said, you designated these late, if the court's not going to strike them, then I want to depose them. And I need more time to do that. I suppose that's possible, Your Honor. That's what you normally do, isn't it? Yes, Your Honor. Except that discovery had significantly closed and we were coming up on our second trial setting as number one. This is not a case where we— Tell us the dates again so that the trial was scheduled for what date relative to this late designation. February, Your Honor. Okay, so every week closing in on a trial matters. Right. And the notion that he did it as soon as possible is just not accurate, whatever the reason. But he wasn't going to be allowed to call them anyway. He did try to call them, Your Honor. He actually subpoenaed them when they appeared in the courtroom. But that's not calling them. No, Your Honor, that's not. However— So he didn't call them. He did not try to call them. Calling them is saying, I call Mr. Smith to the stand. Subpoenaing people to be at the ready is not calling witnesses. You are correct, Your Honor. However, in this case, what happened was these witnesses' attorneys were calling our office. There were doctors who had their own counsel who were calling us and gave us reason to believe that they were being asked to testify. So we spent significant time preparing for the possibility that he was going to backdoor these witnesses. So there was time and effort and money spent on behalf of my client in addressing an issue that we were aware of. Have you had other cases on the eve of trial where late witnesses are designated? I was a former prosecutor, so of course I have. So in those cases, was the other person just barred for three years? Your Honor, this is not why he was in trouble. The real reason— I'm asking you, but can you answer the question? The fact that somebody late designates the witnesses and tries to call them, is that ever a basis for disbarring? Not in the case I've been involved in. I don't know about other matters, Your Honor. With regard to the issue about there being one instead of another typographical error that you asked about, the problem is that it endorsed their billing records, which identified that they had sent a letter to an expert, which is what caused us to have the concern that they were trying to backdoor the experts. We did have those billing records as part of the— From a year before, one single thing about sending—how does that tell you they're calling an expert? Judge, it's consistent. We're getting a call from a doctor— You're saying it's impeaching the concept that it was a typo as opposed to an actual statement of one. Yes, ma'am.  No, Your Honor. They said they had only fact witnesses otherwise. Your Honor, in all due respect, we're getting calls from lawyers who represent doctors. We say they're fine to get contacted to testify who were doctors, who were treating doctors for this patient. These were not just his friends. And we had— You're treating doctors at the rheumatologist clinic, isn't it? It's not these people. The expert testimony, Your Honor, went to the rheumatologist as part of our issue. That was one of our issues, and that was certainly— The other people are not treaters. They're only— The late designation is a separate group, and the issue about the experts, Your Honor. Those are two separate groups of an issue that arose. Right, and that was the none is the late— No, ma'am. The none had to do with whether or not they were trying to call expert witnesses. The late designation had to do with the fact witnesses, and a couple of them have to be psychologists. Okay. Conceptually, your role—not you personally, but perhaps your role in this. And are you here today arguing that it was appropriate for him to be disbarred? Your Grace seems to say so. Your Honor, I did not ask for him to be disbarred, nor did I suggest Boyle's order to disbar him. It's a suspension for three years. Are you here today to argue that suspending him for three years was appropriate? Are you arguing that to this court today? Your Honor, unfortunately, if you lie to a federal judge repeatedly, I'm not sure the court has a choice. And while I hate to see it happen to anyone, I'm not sure—I think Judge Boyle's order, as we briefed, was well thought out— Okay, that's not answering the question. I feel like the person about the state bar debate right now. What I want to know is, are you standing here making the argument that it was appropriate for Judge Boyle to suspend him for three years? Yes, ma'am. Okay, and you briefed that as well. I believe we said that we found that her order was well measured and supported by the records. And, I mean, no one asked you not to do that. I mean, in other words, we didn't appoint some neutral person to file a brief and so on and so forth, and we can do that and have another hearing, I suppose, or another oral argument. But you're kind of put in this awkward position, in my view, of you had to go down there, seek your sanctions. You did. You get called—balled up in this bigger issue where the judge decides to set an inherent powers sanction. Well, at that point, shouldn't you put the brakes on the judge? We can only do this part of the case that pertains to us. We don't have the authority to do—I know you want to expand this. It seemed like you rather zealously embraced the new rule to expand it to all the consumer events in the nationwide. And then she said, oh, I'm not going to go nationwide, but then you went Texas-wide. So it seems like you zealously embraced the rule rather than telling the judge, Your Honor, I'm sorry, but we're not allowed to do that. And I'm not saying that that's—I'm not saying that every lawyer would do differently in that situation because it's a weird thing, and most lawyers don't know how it works. But it doesn't—thank goodness it doesn't come up every day. So I'm not meaning to chastise you unfairly, but you did have a responsibility to say it wasn't appropriate. Didn't you? Judge, I don't—first of all, there's a lot of cases where the court is looking at a Rule 37 motion, which was what was pending, and then the process decides to invoke their inherent authority. That happens a lot more than—we found several cases of that occurring in not only the Fifth Circuit but in other circuits. So it's not unusual for the court to be looking at a Rule 37 motion and in the process learn that there is a bigger issue there. So that's why— It's not inappropriate for you to assist the court in investigating the facts and presenting those and looking at what you did. I think the court is— The question is, in my view, once the court has issued this order, is it proper for you to continue to advocate sort of for the court before us? And I couldn't really—your opponent said he couldn't really find a case. I couldn't really find a case one way or the other that speaks to the post-district court time. I mean, it was coming to us, Supreme Court, whatever other activities may ensue. Did you find a case that suggested that once the court has decided to use their inherent powers and issue these sanctions, that you are prohibited from coming and defending the court's order to us? No, ma'am. The only thing I could analogize this to would be in a situation with a mandamus issue where you would have a federal judge or any trial court judge issue an opinion, then the party who was obviously on the side of the opinion would defend it going up on appeal. That's the closest analogy I could find. Okay. I couldn't find any direct cases on that. Okay. Well, I think the premise of the question, though, assumes that something was appropriate, but I think that our case law says it's not appropriate. So I have a question. The court—this was not limited to the court's own research, was it? I'm sorry, ma'am. You mean that the court— The court did not do its own research to find out about all of these things with the resumes and the other cases. The court didn't do its own research. You found those and presented those to the court, right? On some of the issues I found, on some of the matters the court found, they were things she didn't interest us. But anything that she didn't witness herself, you brought to her from other proceedings and from all over the place, right? Yes, ma'am. There were things that I thought that the judge used to determine whether or not that these things—what those sections should have been, given the fact that you weren't responding to public reprimands by Judge Coy, for example. So you were bringing information to the judge to use regarding her inherent powers beyond the facts and circumstances of this case. Yes, ma'am. But it's different than Crow. Because in the Crow case, there were ex parte meetings where, first of all, that was done in a criminal manner, and it's different. Judge Coy made it very clear she wasn't doing that. Well, no. The Crow part—you look at the first part of Crow, it's the criminal contempt. But then later on, Crow has a whole section about sanctions, and it's in the section on sanctions, not contempt, that deals with the behavior of the counsel that is not appropriate. Do you admit that you did these things so that we can decide whether it was appropriate or not, so we don't have to go, did you do this, did you do that? Did I bring evidence? You brought evidence outside the case to the judge, correct? It was all relevant to the case, Your Honor. If I could give you an example, if I may. Sure. All right. For example, you asked him about whether or not he had been technically suspended. He was suspended from practicing law during the time he took deposition in the White case. It was relevant to the case. Okay. Okay. So it wasn't just a tangential fact that the court will look at the record with Mr. Redfield. That's a specific thing that came up that during, in fact, it had to do with the second deposition he took at the time. He was showing up for depositions while suspended from practice, whether technically or otherwise. In the White case. In this case. Okay. So that was not, the fact that I brought that forward was because it was related to this fact. And it's a fluke that I found out from another case that I happened to be the trial attorney in. Let me ask you this because we may. I don't really feel like we. I'm asking about Crow. Okay. Because I didn't feel like I actually answered my question. Go ahead. Go ahead. Okay. Well, I want to hone in on Crow because we're asking you about your own conduct, and I'm sure that's uncomfortable. Is it your understanding from Crow that what you did in the trial court is appropriate? In other words, that you can go out and gather facts and so forth as long as it's not relating to a criminal contempt? I think that the Crow case allows that. The distinction that I was going to make about the Crow case was the nature of the opposing counsel and the court. If you will remember, in the Crow case, the court actually met with the opposing counsel ex parte and gave him instructions and basically sort of set out how that the prosecution would occur of the attorney that was in question there. This is not the same thing. What I did had started off as a Rule 37 hearing. It was set up in pleadings with our argument without any communication from Judge Boyle other than to say that she, at the end of the first hearing, that she was expanding it. So what we did in terms of, in the vast majority of my questions, Your Honor, were in the Rule 37 section motions of Mr. Raddell before Judge Boyle actually invoked her in her inquiry. Right. I agree with that. Okay. So if it had stopped there, then we wouldn't be having this Crow problem. But unfortunately, it didn't. The vast majority is in the part of Rule 37 and discovery and all of that. It is. But my question for you is, did you, so you brought facts from other cases to the judge's attention and from his resume and from the advertising rules and his contracts. Is that true? You brought all those things. Anything that's here, you brought, right? I'm trying to think. The majority of the things related to the other case were more directed to the law firm, but I do believe we put them on evidence to show the court what this law firm had been doing in terms that after she invoked her in her inquiry. Right. That's the law firm, though. It's not the thing that you brought the motions on. You didn't bring the motions about whether the law firm was unscrupulous vis-a-vis consumers. That was not the purpose of your motion. In the 1927 motion, Your Honor, we did touch on it a little bit in the sense that we talked that it was their pattern in practice to run up attorney seats in these fee-shifting cases, which would be part of a 1927 motion, and that in that context, then that was something the court should consider. Okay. So in that limited context, Your Honor, that's where I would say it was in the 1927 motion. Okay. I'm not sure I've ever gotten a clear answer as to whether, can I assume that if it's in here, you brought it, or is there something particular that you want to carve out that you say the court did on its own? Well, obviously, Your Honor, the fact related to the $45,000, all of that she saw herself, and that to me was the reason why. I'm not talking about in the case itself. I'm talking about anything that's not in the case that she observed that is in this record that they were asked about for days and days. There is one thing, Your Honor, very specifically. We did not bring her the transcript of the scarlet match. She went and found that on her own. Okay. But everything else, did you bring the scarlet case to her attention to begin with? I believe so, Your Honor. I think we actually brought it up with Mr. Myers, not with Mr. Radmel, but I do believe we did. Okay. Can you answer this question? Did you at any time take the initiative to inform Judge Boyle as to matters that would be adverse to Radmel's position? Were you taking initiative or were you responding for what Judge Boyle needed to complete her decision? I was responding to Judge Boyle's questions for the most part, Your Honor, related to the $45,000. That's the part I'm struggling with with Judge Elrod is that the sanction hearing actually started in the trial. In the middle of the trial, the $45,000 sanction started there. So what pursued or what proceeded after that was an extenuation of that, and that was brought by Judge Boyle's specific questions related to, has the $45,000 been brought up to this before? And that's when we first started hearing three different explanations for, yes, it had been disclosed, but in fact it hadn't. Then it was, we don't have to tell you that it was, well, it's mental language, even though these were hard damages. And that's when Dr. White testified or made a statement that indicated surrender of the line to the court. And at that point, that's when the Rule 37 started. So it was in response to what Judge Boyle had addressed. Okay. I have a question precisely from the Crow case also. And we haven't even talked about the other case, the case that the Crow case cites. But first of all, on the Crow case, it says, the logic would appear to be that by avoiding putting opposing counsel in the position of making legal arguments in favor of disbarment, the court sufficiently avoids placing him in the role of prosecutor so as to escape the mandate of Young. Here, the court did not avoid placing you in the role of prosecutor because you had to make legal arguments in favor of disbarment. Your Honor, with all due respect, if you go back and look at the transcript. I have read the transcript. All right. Then the part where the disbarment came up. All of it. Yes, ma'am. The part where the disbarment came up, came up in response to questions Mr. Vazquez's attorney asked me. It was not something I brought up on my own. Did you not – did your co-counsel, was it your co-counsel, argue in closing argument in favor of disbarment? I believe, Your Honor, he said that one of the federal judge warrants disbarment. Yes. Your closing counsel made a legal argument for disbarment in his closing argument, didn't he? Yes, ma'am. Which is against this case, isn't it? Your Honor, I don't read that case as being applicable with all due respect. And the fact is, Your Honor, the question about whether or not disbarment should be considered was brought up by Mr. Vazquez's counsel. It was not something we initiated. He asked us what should happen as a result of the rule 37 motion, and he asked me if disbarment was what I was seeking, to which I responded, honestly, Your Honor, that I hate to see that happen to any attorney. However, he lied repeatedly, and I understand the court doesn't like that word. No one likes that word in our process. I don't have a problem with that word. You can use that word if you think it applies, but be careful that it actually applies. Your Honor, Judge Boyle found that he lied repeatedly about the $45,000. You know, I want to move to a subject we haven't discussed in depth with you, which is what if we agree that there was bad faith conduct, but we are concerned that we have not determined how she got to three years versus two versus one versus something else. What would be the right approach then? So assume for the moment that the majority of the court concludes that there was bad faith, there is to be some form of sanction, but not sure that the three-year has been adequately explained. What would we do then? Your Honor, I think at that point you would have to direct Judge Boyle to either explain where she came up with the three years or to conduct a hearing related to what would be the appropriateness of the sanctions. For example, in one of the cases, the Toclion case, I believe, the court said that they should have considered how much money the net worth of the attorney was, and the court reduced, the Fifth Circuit reduced the dollar amount from I think it was $300,000 to $50,000 because there had been no evidence that the attorney had the money to pay the sanctions that was involved. And that was in the nature of a fine rather than attorney fees. Yes, it was. Okay. So I think the court would have to ask Judge Boyle for an explanation. I would point out that she does – this is the problem we have, Your Honor, which is that in talking about the sanctions, there are all kinds of options that are available. Judge Boyle said that the monetary sanctions, based on the fact that he had not responded to Judge Boyle's public reprimand, and based on what happened in the judge sheet, she found that just telling him was not sufficient. She found that the monetary sanctions was not enough, and then she said, I could go to disbar him for lying to a federal judge, but I want to consider a lesser offense. And so I do think she considered the entire realm, and I think it is in the body of the order itself. The court just has to decide whether or not – if you feel like there needs to be an explanation, why three years instead of one, or why three years instead of six, whatever, then I think you could ask her to explain why she picked that number as opposed to all the other options. But she did consider lesser included offenses and explain why, which is why Judge Boyle's order matters. Okay. We're going to talk about Judge Boyle's and Judge Hughes' order now. Okay. But first, before we do that, I have a question. Do you oppose the court on – if we were to remand, do you oppose the court stating that an independent prosecutor should handle the inherent authority part, or would that be a great relief to you? Well, Judge, no one likes to be in a position to find myself in. Of course. Yeah. To me, the plus is you personally. I'm seeing her in a very difficult situation. I think it would be the court's right to ask Judge Boyle to do an independent prosecutor, as I'm sure the State Department has already considered for their review of the matter of lying to the judge. Okay. But she would still want to stay in on the attorney fee. On your money, you get to stay in. Right. I don't think anyone argues that my attorney fee – No one says you shouldn't be on the attorney fee. Right, right. Judge, I'm not – this is not a money-making deal for me. It's not why I'm here. This is – I think Justice Rieble wrote an article about liars not being in the profession, and I think it's the truth. We have an obligation to support judges when they do what is the hard thing to do, which is to find that someone has, in fact, lied to them repeatedly over the primary issue, which is the $45,000. Right, and that's very important. But you also recognize that sometimes the person who's been on the other side of it is not always the best person to be the prosecutor of it. Judge, it is a lot harder to be an advocate when you're an advocate because that's what you are. Exactly. Judge Hoyts and Judge Hughes – everybody gets two more minutes. Judge Hoyts and Judge Hughes' opinions. Judge Hoyts' opinion is problematic because what he's chastising them for is the subject of a big deal regarding paying off people in these consumer cases that is going to be argued to the Supreme Court this term. And so being technical on that is arguably legitimate. So it's hard to see that he would have to apologize for Judge Hoyts sanctioning him for doing something that if the Supreme Court is considering it this term, certainly within the ballpark, it is related that you make it as technical as possible so they can't use the offer of judgment. Why isn't that fair of all? Well, Your Honor, I think the problem really is the context in which Judge Hoyt was looking at it, which is that will he take or will he respond to a lesser sanction? And the fact is that despite the fact that Judge Hoyts, who at that time the case was not pending before the Supreme Court, the fact that Judge Hoyt found it to be gangsmanship and actually wrote an opinion about it and then Mr. Rangel turns around and does the same thing in the white case. But shouldn't he keep doing it if he thinks it's a legitimate legal argument? The fact that someone thinks it's not appropriate, if you believe that it's appropriate, the fact that one judge thought it was being ticky-tack gangsmanship, if you think it's crucial to American justice for consumers, then why shouldn't you continue doing it in every court that you can to try to get that before someone? That's how you advance the law in the way that you think it should be. I don't see that that's wrong. Your Honor, if it were only one thing, then I would agree with you. But it's a pattern, and that's what Judge Hoyt talked about. Okay, but she used something for the pattern of why lesser sanctions was that's not really anything wrong. If that's the court's opinion, I understand that. But it's not the way Judge Hoyt thought. Okay, but Judge Hughes' thing got vacated. She used that. So in any event, the things that she used to say were lesser, no longer in the eyes of the law are they seen as offenses that he committed. So why shouldn't she relook at it just to look at it afresh anyway? Okay, if I could, let me go to Judge Hughes' order. The thing with Judge Hughes' order, if the court goes back and looks at the Garland decision, what was vacated was the right for the court to have jurisdiction over the matter of the given. They did not touch whether or not Mr. Radville acted inappropriately in handling the case. Judge, I write that the opposing counsel acted inappropriately. In the dissenting order, Your Honor, that's correct. The primary order did not find that judge. And Judge Hughes described for Judge Boyle similar things that she saw in the courtroom. The fact that it may not be something that legally was enforced against Mr. Radville, it goes to whether or not Judge reprimanding him or giving a monitor station would change his behavior, which is what Judge Boyle was looking at. Did he learn from being publicly told to do something differently or from even getting a monitor station? And what she found, I think it's listed in the order, is that no, he did not learn his lesson from things that would have gotten the attention of other attorneys. But maybe he's not supposed to learn a lesson from those two things if he didn't do anything wrong. In all due respect, he lied five times, at least about 45,000 times, eight or nine times. Yeah, I want to get – at the end of the day, the opposing counsel made a chart on page 18 of their reply brief. I'd like to finish up with you, unless other of my colleagues have questions for you, going through what are the lies that are bad faith that still remain, okay? And so I guess you've mentioned repeatedly the $40,000. $45,000. Yeah, the $40,000 plus the $5,000 for the other – one is $40,000 for the loan and one $5,000 for a class. For not teaching the class. Yeah, not teaching the class. Right, that's one of the issues. In that case with the $45,000, the initial statement that Mr. Raddell made at the oral 37 hearing in trial was that he had, in fact, disclosed those numbers to us. And when I produced the disclosures where they were not present, he then told Judge Boyle, well, I wasn't required to do it. I'm not required to quantify actual damages. And then Judge Boyle said, you know better than that. And he said, well, I'm not required to quantify them because they're mental anguish, even though the category we're talking about were not mental anguish damages. They were hard damages, if we can use that term loosely. And then he told Judge Boyle that he believed that they had been told to us in a mediated settlement conference with Judge Stigney. So that's the first thing he said. He waits. We have the briefing on the oral 37 motion. And it took some time because we resolved the court costs against his client first. And over those several months, then he briefed a new time. And this time the story is, well, he didn't have to tell us about the damages because they were contained in a term client communication with his client. And that we somehow should have known to ask the court to require him to disclose it. And then he says that, again, that they weren't required to be done at that point. We get to the sanctions hearing and we begin the sanctions. On examination by his then partner, Mr. Myers, he says that this is something his client said, that he did not tell him to do that. Mr. Myerson calls it a rogue client response, which essentially Mr. Raddell adopted in the communication. So now we're up to another story about why they did not tell us. Then we get to the new attorney stepping in on behalf of Mr. Raddell. And now the story is, well, we didn't have to tell you about them because these were really damages that should have been applied to Texas Guarantee as opposed to RID. So there was no duty to tell you them. And then they provide this affidavit from their client with an attachment that refers to a December 28 memo, which is very important because we didn't have records for December 28, attorney records. So we could not have been the earlier memo that they were discussing. So on top examination, what I'm saying, this is not the memo that was discussed in your records because the date's wrong. Then his counsel produces a December 6 memo. And the December 6 memo on the very first page has the $45,000 that we've been discussing that they never disclosed to us. Now their argument is, well, it was a strategy decision that he made on his own and he had no duty. In their brief, they say he had no duty to disclose that strategy to their client, which isn't exactly correct, Your Honor, because Rule 37 motions put sanctions to have applied against their client. So certainly he had a duty to tell his client, you can't bring up these damages because we haven't done it. Under Rule 37, the client could have been responsible. So we now have eight or nine, I would count different exclamations, 44 to 5,000. And Judge Boyle spent more than six pages talking about just that memo and how it shows that he lied all along regarding the $45,000 that he knew from the very beginning. These were not memo language damages. These were not damages that were not disclosed. Judge? Did it matter whether or not he asked a question that said, tell me about your damages?  He asked a question, have you paid your loans? What's the status of your loans? And you would ask that in every single case to show that the person's not a deadbeat. That would be just a, that would be, you would always ask if the person's paid off their loans in any kind of consumer case. And it doesn't secretly lead to them blurting out $40,000 in a normal case. Your Honor, if you have to go back to what Dr. White said to Judge Boyle, which was a spontaneous statement, I was assured by him they would be committed in this trial. So if that is what your client believes and you ask them a general account question about what are your actual damages, then every attorney would expect their client to give them the answer about damages that they believed from their own counsel would be submitted at trial. Okay. But the question doesn't evoke the answer. It does, Your Honor. There's more than one question. If you look, he asked about the status of loans, and Judge Boyle also cites a situation where he talks about, he asked him, what are your actual damages? And he says, I have separate actual damages, and then go on to discussing the $40,000. The $5,000 absolutely came up on the crime examination. But the $40,000, the point is, Your Honor, we don't represent our clients in a vacuum. We don't get to decide the strategy and not tell our clients, and let our clients blurt out things that we know should not be submitted. It's very minimal. That's the problem. We were going over this chart, and I appreciate that you gave a really thorough answer about the thing that's the center of the case. And that was helpful, and I appreciate it. Thank you. But I have a question. Is that what you rise and fall on the bad faith on that incident, or do you stand for any of these other incidents, which are 13 pages, 13 entries, which your opposing counsel says that many of them have been abandoned or are not a basis? Do you rise or fall on the 40, or do you have others that you think also are bad faith? Your Honor, that alone, that alone, the $45,000 alone, justifies Judge Boyle's opinion. And in fairness, Your Honor, we didn't abandon anything. We're, you know, the idea that we can abandon Judge Boyle's order, we've written no briefing, James. Okay. But are you pressing? What other issues are you pressing today? Well, the ones that we gave examples to the court certainly had to do with the nuns versus one. We've already addressed that somewhat. Try to get back through it. I think the $45,000 is a common thing. The misleading to Judge Boyle about recalling the witness and not… Robert Wyatt. Yes, that's what you're talking about. Okay. In the way that context came out was certainly a factor in the issue. But Judge… And was there ever any medical evidence of any kind to support this notion that he had some kind of condition that made him late that morning? No, ma'am. I mean, there wasn't any evidence of lactose intolerance, because that's something you have not just that day. Right. And the judge observed him to look fine and not seem to be ill. And that would be a fact-finding we give deference to? Yes, ma'am. So is that relevant, then, to the question of sanction? Yes, ma'am. I do think that… But is it relevant because she didn't cite that as a reason for his sanction, for his bad faith? She went over it early in the opinion, but later she did not come back to it as one of the bases for the bad faith. At one point she says that this entire order is replete with bad faith behavior, and that is the basis of my opinion. So I think that she, in shorthand, does continue to say that I find that what his behavior was was inappropriate. So she found that he lied about that. I don't find that she actually makes that finding. I actually have a listing of all the places that she said he lies. If at one point, if you would like, Your Honor, I'm happy to give you recommendations. No, but I mean, in the summing up of her order, she doesn't say he – and he lies to me about being late to court. And she did find that he wasn't credible. Earlier on, but she doesn't use that as a finding. Well, she said she relied on the whole order. But that's not a finding for the bad faith. You've got to look at the findings and the holdings. She relied upon the entire findings of fact, which were 50 pages long, and that's one of them. That is correct. She didn't say everybody who has intestinal problems go to the doctor and have doctor things on that, no. Well, wait a minute. He said he was lactose intolerant. But people know that themselves. They eat things. I just don't find that – Your Honor, he said he took a medication that was the reason he didn't wake up. You wouldn't have a medication unless there was some medical basis for it. That was his testimony. Not quill. Your Honor, in all due respect, that was not the implication he gave to the court. Okay. But what are the – let's finish my question. None versus one, 45,000, Robert Wyatt. What else is there that you're standing on, that I'm standing on? Judge, I don't get past the 45,000. I can tell you all the others. I don't know that it's fair to you to criticize you for coming and representing Judge Boyle's order to us and then also requiring you to sort of stand or fall. Your sanctions for getting your attorney's fees can rise or fall on the 45,000, and you feel comfortable on that. Yes, ma'am, absolutely. Right. I'm asking you, what do you argue today? I think the $45,000 warrants the actions that Judge Boyle took. I think the other things give you a flavor of why she did not believe him, and I do think if we put out in our briefing, those were issues about showing that he had a credibility issue to the court that repeatedly lied. What happened here, Your Honor, is very simple. We have a young lawyer who made a mistake, and had he said when she caught him about the $40,000, had he said, Judge, she's right, we're not disclosed, I'm sorry, we wouldn't be here. But instead of admitting that, he started lying about why he didn't have to do it or how it came about, and it's those repeated lies about the $45,000 that has us in front of here. Any one of the other matters wouldn't rise to that level. The repeated lying about the $45,000 is what got Judge Boyle upset, which is why we should all be offended by this action by any attorney. You cannot lie to a judge repeatedly and have it stand up. I don't know whether Mr. Radbow is a congenital liar, or maybe he has a misconception of effective advocacy. It may well be more the latter than the former, but in any event, I'll stand on Judge Boyle's findings. Thank you, Your Honor. Do you have any more questions, Judge Elroy? Not at the moment, but if we do, we'll ask for further briefing. Thank you. Normally when I get up on rebuttal, I like to say I just have a few points, but I'm afraid that may not be true. Can I just ask you, I mean, whether he needed it or not, he did not bring any medical evidence to the court. Is that clear? Okay. Go ahead. Let me just start with something about contrition, because I know Judge Haynes asked about it. Mr. Radbow has been practicing for two years since the last sanctions hearing. There is nothing in the record about him committing misconduct. He has not been sanctioned by anybody. He has been practicing in federal and state court and doing corporate work, and there is nothing indicating he is some sort of congenital liar who wrecks our courts. I think in that context, he deserves a chance to be a good member of our profession. And the fact that this case went wrong, and there's no doubt it went wrong, I'm not defending it, shouldn't end his career. I mean, you know, you've got the chart that Judge Elrod referenced, which to me the important thing is this guy did a fine job. He made a couple mistakes here and there, but overall, you know, did fine. Now you're coming and saying, well, you know, he's contrite, he's learned, he's now gone on the straight and narrow for the last two years, and we should give him another chance, which I don't really think is our prerogative. I mean, that is a discretionary matter for the district court. If we were to remand it for consideration of those two years, that's a good argument to be made, I would say. But the whole tenor of everything that's happened up until pretty much this moment has been to pretty much say he didn't do anything wrong other than a mistake or two, and then he's sorry for being late to court, but if he was really sick, then he has nothing to apologize for there. And yet there's a question about whether he was really sick, and we, you know, we just have to go with the district judge's evaluation of that. Do you understand my concern? Because I'm not really sure this – I think he's gotten the message that Judge Boyle is upset with him and that people are watching him, but has he gotten the message that he did wrong? We're still sitting here having an argument about exactly what he did wrong and all that because of your chart and your briefing. Well, I mean, if I may skirt outside the record a little bit since you've asked me directly, my answer to that is yes, he understands what happened. I've been counseling him in this case and in the Scarlet v. Nissan matter where I was appellate counsel, and he understands that these things were not good. The cases didn't go well, but he did not act in that faith. Why didn't he just own up to – if it was a mistake on the $40,000, if his client thought it had been submitted and blurts it out, he wasn't expecting that. Why not just say, you know what, my client blurted that out, didn't realize it wasn't in the case, I'm sorry, let's move on, I agree, but please, Your Honor, instruct the jury to disregard and we'll move on. It seems like to me a guy who makes mistakes and then tries to lie his way out of them. That's how it looks to me, and that's a concern to me in terms of just acting like, well, we shouldn't sanction the guy or just give him public reprimand or whatever. I understand your concern 100 percent, Your Honor. To your specific question, why didn't he just say, look, I don't know, Your Honor. That really is the answer. I don't know whether I specifically said $40,000 or $5,000. I'd have to go look, but let's exclude it for the time being. I mean, that's really the answer, and I have no idea why exactly at that moment he didn't say that. But then he compounds it by continuing to change the story. Even if we just focus on the $45,000 vis-a-vis the attorney's fee sanctions and so forth and even forget about the three years, that's a concern to me. I was a state district judge. A lot of people came in and made a lot of stories and didn't designate things. I'm not like, eek, I've never seen this before. I mean, I understand how this works. But it's concerning to me that he continues to dig himself deeper instead of just saying, all right, I didn't designate or I waited a few weeks before I designated something or whatever. Let me try to disaggregate that a little bit. At the time when the problem arose, and let me just say maybe this is too ticky-tack on my part, but there was no objection to this question. I don't think the question was objectionable. There was nothing wrong with asking, are you a deadbeat about your student loans in a consumer fraud case? But there was no objection from another scientist to the question. And you'd expect that if it was so terrible a question and the answer was so terrible, there would be some immediate objection. And there wasn't. And then they dug right back into it and elicited the $5,000. So let me just, as a flavor, let me just say that. But in terms of his answers, at the moment his answer was not the best. There's no doubt about that. If I was there, I would have told him the answer differently. But then when he had time to think about it, in his Rule 37 briefing he said, I never intended to ask for these sanctions. And then at trial, when he's represented by counsel and the full gravity of what is happening comes before him, he really thought about it. And he came up with what is actually the answer, which is that you can't seek $45,000 against RID. Okay, but I guess the problem, as I see it, is I think it is possible for a judge to look at this and come to the conclusion that he made a mistake, he didn't give a good answer, then he thought about it, he gave a better answer, and so on. But it's also possible to look at it and come to the conclusion that I articulated based on what Judge Boyle found, who is the person on the spot? I mean, this case comes across, and you can see it from the briefing and everything else, as a chaotic, messy case largely due to Mr. Radville. It didn't need to be based on its actual merits. And so Judge Boyle was the one there to look them in the eye. We haven't looked Mr. Radville in the eye. She was the one who did that and said, this is a guy who is incompetent and is covering up for it. Why should we set that finding aside? Isn't that exactly what we ask district judges to do, make findings, and we just review them? In general, that is what you ask district judges to do, and in general, there's an abuse of discretion standard. But let me delve into that. And of course, my position is you don't need to do that. You can reverse this case on what I call the least severe sanction problem. You don't need to go into the facts. It's a crisp, clean opinion that sends it back for Mr. Radville to get another chance at this. But directly on your question, this is not normal abuse of discretion review. I've been looking at these standard review cases on these things. They're not clear, but it's searching. It's searching and careful. And I think that when you apply that sort of heightened abuse of discretion to this kind of extraordinarily grave sanction, what you need to do is really probe those facts one by one. And when you look at that $45,000, I don't think the district court's – excuse me, I should say $40,005. I don't think the district court's holding – Part of the problem is that the whole nuance of the case, just presiding over it, being part of it, seeing all this happening, seeing Mr. Radville, seeing how he interacts, all of that we're totally missing. To sit there and go, well, did he say one or none, and is his typewriter messed up, or his computer makes mistakes. You know, I mean, this strikes me as the kind of thing that is exactly what we shouldn't be doing, sitting there and going, well, I don't know, it seems like you could have – you know, people are always three weeks late in death in any way. I mean, this is exactly what a district judge who saw the whole thing, and saw the witnesses, and had five sanction hearings – it's not like she just did this on the spot and goes, guess what, buddy, you're disbarred, see you later. She had five hearings on this over time, and the trial, and all this briefing, and she did some of her own research, and she received the research from all of you all. And that's exactly, to me, she lived it, and we didn't. And I guess I'm having trouble then saying, well, we're going to find that we believe his story now, that he's contrite, but he also says he didn't do it, but also whatever. No, I understand the concern. This is – you're almost dealing with a jury trial type situation, but it doesn't get the deference that a jury trial does. And I think part of the problem – and I say this with respect to the district court. I'm not here trying to impugn her, but the way she crafted this opinion and putting together this – what I call the sort of mosaic of misbehavior, whatever it is, that's the problem. We don't know what the bad faith conduct was. Well, I think that's a very disingenuous argument that she didn't find bad faith. She has – there's so much there. She doesn't want to keep repeating it. She's already used 83 pages. I don't really fault her on that. You didn't say she didn't find bad faith, did you?  I'm saying that she doesn't specify what the problem is. It's mosaic and not specific about what the specific bad faith is. You did argue that in your brief, that she didn't make a finding of bad faith, and she did. And it is quite – you're in a sense holding against her the fact that there's so much detail. If she'd only written 10 pages, you'd say there's not enough there. So I think she can rely on all 83 pages and doesn't have to keep repeating everything you did over and over again. And the fact that there's 83 pages to deal with here and to parse through, to me, is also very disturbing. So I don't – but I want to go back to – because this is a question that has to do with sort of a law. I understand the search and inquiry and all of that, but it seems to me when it boils down to credibility, do we believe he was mistaken and for the moment gave a bad answer, or do we believe he was incompetent in covering up? That is the sort of thing we give deference to because I don't know how we can possibly evaluate that here. I understand that, Your Honor, but I think that when you're imposing this kind of sanction, if it were okay for the district judge to say, you know what, I think this person is telling me a lie, and I don't have a specific thing to base that on, I just don't believe him, then there is no review of these inherent power sanctions. What is someone in Mr. Ratliff's position to do out here? Well, we do have a record to look at, and to me there are inferences that one could draw either way on some of this. I think that – I mean, on whether he was ill. I think that's something you can look at somebody and go, you look fine to me. You don't look like you were so ill that you couldn't even send a text to someone to let the court know. And that is something that, you know, you look at the person, you make that evaluation. He maybe could or could not have brought in medical evidence. To the contrary, he didn't. So why wouldn't we give deference to that? I don't know if he was sick or not. I wasn't there. She was. She looked at him and said he didn't look sick. He didn't look sick enough for this kind of situation where he just appears without ever calling or texting someone. I mean, I've been very, very sick in my life and still could get a phone call off. Let me just answer that particular thing very quickly. It's not that he was sick and was unable to call. It's that he was sick the night before, couldn't wake up, and the second he woke up, he did call the court. That's in the record. And then he ran at a sprint over to the courthouse. I understand your general point. I'm just saying that it's not that he was throwing up and wasn't able to text. It's that he had fallen asleep. Whatever. But she didn't believe him. She didn't believe him. And why would we then believe him over her? My view is that if she's not going to believe him, here's what, for example, she might have done. She might have said, okay, Mr. Randall, I don't believe you. Bring me the note that says you have whatever it is you have. And if there's a note that says you're sick, then I'm not going to make a finding of bad faith against you. If there's no note, you've just lied to a federal judge. And I think that would have been the kind of evidence she could have used to say I don't believe you. But here, she's not a doctor. She doesn't have medical records. But she already is predisposed not to believe him based upon their prior dance in this trial. That's right. So everything that's going on is contributing to this thing. And that doesn't necessarily cut in your favor. No, it doesn't. She's already, we have people late all the time. We've all been trial judges. And we have people late. We have people not show up for arguments for Fifth Circuit two months ago. People lied about being at lunch, about being sick when they were actually, their secretary said they were at lunch. But they didn't get this far. Maybe they should have had some proceedings. But what I'm saying is she already had a, she was already having an impression of him that was being corroborated by everything that was going on. And everything was cutting against him. He wasn't getting any benefit of any doubt at this point. Fair to say? That's fair, Your Honor. And I know you've read the record. And I know you see where the things turn against him. It's really at the end of the first day when they're doing some after-court discussions. And the judge expresses that she already doesn't believe him. So it's not really this $40,000 and $5,000 issue that opposing counsel is talking about. The judge didn't believe him from the beginning because she thought he was incompetent. You know, he didn't know how to do the witness designation. He didn't know how to do exhibits, whatever it was. And she really believed that he had been put into a position and was acting in a way that shouldn't be in federal court. I have a legal question about whether or not it is correct to rely upon, if we are allowed to look at this mosaic and look at every single thing in there rather than just the findings, do we have to go through the things that are obviously not in the inherent powers and take them out and see if it still stands without those things? Or should we send it back just because it has those extra things in it? I mean, I think it's the latter. That is a real problem in this case because this court has said that you use the inherent powers when nothing else helps. When the person's misbehavior is such that not Rule 37, not 1927, not Rule 11, there's no other option. You invoke the inherent powers. And here what we have, at worst, even assuming the court disagrees with me on the facts, at worst we have discovery, sort of, misconduct. At worst, and I disagree with that. That is covered by Rule 37. You don't think at worst we have lying to a federal judge repeatedly? Well, I'm sorry, Your Honor, I shouldn't say that. If you disagree with me about what he said, yes. But the thing – if she's relying upon resume items and advertisements and that's informing the judgment, those are not within – positive software would not countenance us looking at those. That's right, Your Honor, and I think that that's part of the problem. I didn't mean to make the argument she didn't make bad faith findings. In fact, they're so intertwined with the other things. When Mr. Jefferson told her in the most polite possible way early on when he arrived, Your Honor, your inherent powers only go for what's before you, not for everything that this law firm or these people or this – your client has ever done. And whenever it went on a roving expedition is where it went beyond what our court precedent would allow. What I'm asking is can it be – I guess we've got one or two choices. We can say, well, you can look at the mosaic and then cut out everything that's in the mosaic that's not part of inherent powers and it's still good enough. Maybe you can do that. Or we only look at the judgment part of it and it doesn't contain these random roving things. Or you can say that you have to send it back because it's infected with things that are beyond inherent powers. Or I guess for you to win, we should just throw it out. But I don't think the court is that inclined to do that at this point. Fair enough. But yes, I think you can send it back because it's impossible to cut out the things that are inappropriate from the things that might or might not be appropriate. I can't figure it out from this opinion. And the way we know that is that there's a dispute between counsel as to what the bad faith actually is. When you're reviewing an inherent power sanction, to me, it needs to be clear. What is the gift and how does the sanction tie to that? Does anybody have any further questions? Your time has expired a long time ago. Thank you very much. Thank you. I want to thank both counsel, though, because this is a very difficult case, and I appreciate you all working through the questions with us. Thank you. Thank you. Helpful. Helpful argument. Thank you. The court will stand and recess until 9 o'clock tomorrow. Thank you.